Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL (X)

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>ALEJANDRO BARBOSA SANTIAGO<br><br>Acusado-Recurrido | KLCE202500605 | *CERTIOARI* procedente del Tribunal de Primera Instancia, Sala de Mayagüez<br><br>Crim. núm.:<br><br>ISCR202400102<br>ISCR202400103<br>ISCR202400104<br><br>Sobre:<br>Art. 6.05 L.A.<br>Art. 612 L.A.<br>Art. 6.22 L.A. |
| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>RICARDO ALEXIS TORRES RODRÍGUEZ<br><br>Acusado-Recurrido | | *CERTIOARI* procedente del Tribunal de Primera Instancia, Sala de Mayagüez<br><br>Crim. núm.:<br><br>ISCR202400097<br>ISCR202400098<br>ISCR202400099<br>ISCR202400100<br>ISCR202400101<br><br>Sobre:<br><br>Art. 6.05 L.A.<br>Art. 6.22 L.A.<br>Art. 401 Ley 4 (2 casos)<br>Art. 412 Ley 4 |

Panel integrado por su presidenta la juez Lebrón Nieves, la jueza Romero García y el juez Rivera Torres.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 5 de septiembre de 2025.

Comparece ante este tribunal apelativo, la Oficina del Procurador General de Puerto Rico en representación del Ministerio Público (el Procurador o la parte peticionaria) mediante la *Petición de Certiorari* de epígrafe solicitándonos que revoquemos la

Número Identificador
SEN2025_____

*Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI) del 1 de mayo de 2025, notificada el mismo día. Mediante este dictamen, el foro primario declaró *Ha Lugar* a las solicitudes de supresión de evidencia instadas por los acusados, los señores Ricardo Alexis Torres Rodríguez y Alejandro Barbosa Santiago. En su consecuencia, suprimió, sin orden judicial, toda la evidencia del Ministerio Público ocupada por el Agente Radamés Miranda Pérez (Agente Miranda Pérez).

Por los fundamentos que expresamos a continuación, expedimos el recurso de *certiorari* solicitado y confirmamos la determinación recurrida.

**I.**

Por hechos ocurridos el 11 de mayo de 2022, el Ministerio Público presentó acusaciones en contra del Sr. Alejandro Barbosa Santiago (señor Barbosa Santiago) y del Sr. Ricardo Alexis Torres Rodriguez (señor Torres Rodríguez) (en conjunto, los recurridos) por violaciones a los Artículos 6.05, 6.12, 6.22 de la Ley núm. 168-2019, conocida como la *Ley de Armas de Puerto Rico*, 25 LPRA sec. 461 *et seq.*, y a los Artículos 401 y 412 de la Ley núm. 4-1971, conocida como la *Ley de Sustancias Controladas de Puerto Rico*, 24 LPRA sec. 2101.

Según surge del expediente, las acusaciones surgen como resultado de una intervención policial sin orden judicial previa ocurrida 11 de mayo de 2022, en la Carretera número 106 en dirección al camino Charluisant en el pueblo de Mayagüez. Ese día, se llevó a cabo un plan de vigilancia preventiva de la Policía de Puerto Rico en la Región de Mayagüez en el que participaron el Agente Miranda Pérez y el Sargento Luis R. Aponte (Sargento Aponte), entre otros.

Como parte de dicho plan de prevención, los agentes se dirigían por la dirección antes mencionada y como resultado de la

intervención allí realizada, se arrestó a los recurridos y se ocupó, según surge del expediente, dos armas de fuego, cocaína en su modalidad de roca, marihuana y parafernalia.

Luego de varios trámites procesales, el 30 de abril de 2024, el señor Torres Rodríguez presentó una *Moción Solicitando Supresión de Evidencia.*[1] En esta, adujo que, de la prueba desfilada en la Vista Preliminar, en especial el testimonio del Agente Miranda Pérez, surgió que la intervención fue ilegal, irrazonable y en violación de los derechos constitucionales. Por ende, expuso que el registro, sin orden judicial previa, se basó dicho testimonio que era uno totalmente estereotipado. Además, argumentó que dicho testimonio era uno descarnado y que se ciñó a establecer los elementos mínimos sin detalles para reforzarlo.

Añadió que, resulta irrazonable creer y pensar que la evidencia se encuentra a simple vista cuando surge del mismo testimonio, que el señor Torres Rodríguez se encontraba en un lugar en donde podía esconderla sin ser observado. A su vez, arguyó que, debido a que fue una intervención sin previa orden judicial, se activó la presunción de ilegalidad que debía ser rebatida por el Ministerio Público; lo que no pudo rebatir la parte peticionaria. Por tanto, solicitó la supresión de la evidencia incautada al amparo de la Regla 234 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 234.

Por su parte, el 10 de mayo de 2024, el Ministerio Público presentó su escrito en oposición a la moción de supresión de evidencia.[2] Mediante este argumentó que la moción, presentada por el señor Torres Rodríguez, no cumplió con los requisitos esbozados en la Regla 234 de las de Procedimiento Criminal, *supra.* Señaló que el acusado no expuso hechos o fundamentos que reflejaran la ilegalidad o irrazonabilidad del registro, allanamiento o incautación.

---

[1] Véase, el Apéndice del Recurso, a la pág. 35.
[2] *Íd.*, a la pág. 41.

Añadió que, al ser evidencia a simple vista y evidencia abandonada, esta no gozaba de una expectativa de intimidad que pudiera ser violentada. Además, precisó que el testimonio del agente Miranda Pérez era uno preciso, detallado y honesto. Por ello, solicitó que se declarar *No Ha Lugar* a la referida moción.

Por otro lado, el 20 de mayo de 2024, el señor Barbosa Santiago también presentó una *Moción de Supresión de Evidencia.*[3] En la misma, argumentó que, del testimonio del Agente Miranda Pérez, surge que no tenía orden de arresto, ni de registro y allanamiento. También que no se estableció distancia ni posiciones del vehículo y sobre sus ocupantes. Incluso, tampoco se demostró que no hubo comunicación, ni una orden de alto, ni incidente alguno que provocara que el individuo saliera del vehículo y, mucho menos, con un arma visible. Pues, en ese sentido, el agente no se identificó como policía ni surge de su testimonio que surgiera una confusión que le llevara a concluir que estaban siendo atacados para justificar salir con el arma visible. A su vez, adujo que se cayó brincando una verja pequeña y que, supuestamente, abandonó justamente lo que intentaba esconder. Mientras, surgía todo esto, del testimonio surge que el sargento Aponte no intervino, ni ningún otro agente que participó del mismo operativo.

De manera que, a su entender, el testimonio del agente era uno estereotipado que crea una controversia sustancial de hechos, aún bajo el escrutinio más estricto aplicado. Razonó que ello era así, ya que del testimonio del agente resultaba su propia irrealidad e inverosimilitud, ya que no demuestra motivos fundados en derecho para la intervención. Por ello, solicitó la supresión de la evidencia obtenida como parte de la intervención que catalogó como ilegal.

---

[3] Véase, el Apéndice del Recurso, a la pág. 49.

Como consecuencia de esto, el 18 de junio de 2024, el Ministerio Público presentó, nuevamente, escrito en oposición a dicha moción en la que replicó los fundamentos esbozados en la primera moción en oposición a la supresión de evidencia.

Así las cosas, el 7 de abril del 2025, el TPI celebró la vista de Supresión de Evidencia. En esta, se presentó testimonio el Agente Miranda Pérez. A continuación, procedemos a resumir los aspectos relevantes del testimonio del Agente Miranda Pérez, de la controversia ante nuestra consideración, según vertidos por este en la vista.

En el interrogatorio directo, el Agente Miranda Pérez declaró ser oficial de la Policía de Puerto Rico, adscrito a la División de Drogas y Vicios de Mayagüez. El 11 de mayo de 2022, en la mañana compareció ante el tribunal y, en horas de la tarde, pasó a la división de drogas y vicios para recibir instrucciones del sargento Luis R. Aponte. Como parte de esas instrucciones, se le informó que formaría parte de un grupo de agentes bajo un plan de vigilancia preventiva y patrullaje. El plan consistía en la asignación de vehículos oficiales confidenciales dirigidos hacia el área de Las Marías y Maricao, dentro de la región de Mayagüez.

Relató que iba en el primer vehículo, en la posición de pasajero en la parte de al frente del automóvil. El chófer de dicho vehículo de motor, lo era el Sargento Aponte. Indicó que se dirigieron por la Carretera 106 en dirección hacia Las Marías. Mientras transitaban por la Carretera 106, decidieron realizar un viraje hacia un camino conocido como el camino Charluisant, el que fue descrito por el agente como un área de alta incidencia criminal en el que él, personalmente, había realizado intervenciones anteriores.

Al adentrarse al camino Charluisant, observaron un vehículo detenido en medio de la vía, el cual impedía el libre tránsito por la vía pública, ya que la carretera era una estrecha y bidireccional.

Describió el vehículo detenido como un Mitsubishi Outlander, color azul claro. Aseguró que, desde la posición en la que se encontraba, observó a dos personas dentro del mismo. Estimó la distancia como equivalente a la de un carro de distancia, entre el vehículo oficial confidencial y la Outlander. Por espacio de segundos, se mantuvieron observando si el vehículo se movía. Añadió que, al poco tiempo, vio cuando del lado del conductor del vehículo detenido en medio de la vía, se bajó un individuo, con camiseta negra, pantalón corto azul, quien en su mano derecha portaba una pistola negra con anaranjado, mientras que en su mano izquierda llevaba una cartera negra.

El Agente Miranda Pérez, identificó en Sala al señor Torres Rodríguez como la persona que portaba el arma y la cartera antes mencionadas. En su testimonio, aseguró que el acusado intentó brincar una valla, se tropezó y se cayó. Justo en ese momento, se desmontó del vehículo y se acercó al área en donde ocurrió la caída. Desde ahí, alegó, que vio al individuo rodando y cayendo, porque era una cuesta bastante empinada y, donde cayó la pistola color anaranjada y el bulto cartera color negro. Acto seguido, el agente dijo que le ordenó al individuo que se detuviera y, por primera vez, se identificó como policía. No obstante, el individuo continuó a la huida monte adentro.

Mencionó que, al detenerse al lado de la valla, justo por donde, alegadamente, brincó el individuo, notó que dentro del vehículo se encontraba el otro acusado. Observó por la puerta que supuestamente estaba abierta y vio al pasajero, a quién identificó en Sala como el Sr. Alejandro Barbosa Santiago, manipulando con su mano derecha lo que parecía ser una pistola negra, escondiéndola en la consola central del vehículo. Narró que, desde su posición, le ordenó al señor Barbosa Santiago levantar las manos y soltar el arma. Le dio instrucciones de salir del vehículo con las

manos en alto y procedió a arrestarlo. Eventualmente, por primera vez en toda la intervención, el Agente recibió ayuda del Sargento Aponte para poner bajo custodia a este acusado. Luego se dirigió hacia la cuesta empinada para ocupar el arma de fuego y la cartera abandonada por el señor Torres Rodríguez.

A preguntas del fiscal, explicó que el primer acto ilegal que justificó su intervención fue observar al señor Torres Rodríguez portar un arma de fuego al momento de huir, acción que calificó como la razón para intervenir con él. La intervención con el señor Barbosa Santiago se justificó, al ver que este también poseía un arma que intentaba esconder. El testigo detalló que el arma ocupada al señor Barbosa Santiago era una FK .40, completamente negra, mutilada, con seis balas. Mientras, que el arma abandonada por el señor Torres Rodríguez era una pistola SCCY anaranjada y negra, cargada. Añadió que, dentro de la cartera abandonada, ocupó múltiples bolsitas plásticas con cocaína en modalidad de *crack*, cocaína en polvo, una bolsa grande de marihuana, una balanza y parafernalia.

Luego, expuso que trasladó al señor Barbosa Santiago y la evidencia ocupada a la División de Drogas de Mayagüez, entregando la evidencia al Agente Wenceslao Padilla y que en la prueba de campo arrojó positivo a cocaína y marihuana. También indicó que, mientras realizaba el trámite mencionado, se recibió una llamada al retén del cuartel, quien se la transfirió a él. Insistió en que, producto de la llamada, una voz masculina se identificó como el padre del señor Torres Rodríguez e indicó que la madre de este le había comunicado que su hijo estuvo involucrado en una intervención policial. Esto provocó una objeción de la defensa de los coacusados por ser prueba de referencia, la cual fue declarada *No Ha Lugar* por el foro *a quo*.

Según el Agente Miranda Pérez, ello provocó que decidiera buscar al señor Torres Rodríguez en el sistema de información de del [Departamento] de Obras Públicas en donde comparó la imagen de este con la persona que se fue a la huida de la escena. Especificó que lo identificó como la misma persona que dejó abandonada la cartera y la pistola SCCY.

En el contrainterrogatorio realizado por el Lcdo. Roland Arroyo Rojas, este le cuestionó al agente la naturaleza del supuesto plan de vigilancia, la coordinación del mismo y las actuaciones de los agentes. El agente respondió que había entre 11 y 12 agentes, todos bajo la supervisión del Sargento Aponte y con instrucciones de patrullar y vigilar. A su vez indicó que iban a vigilar para transmitir motivo fundado, si se daba la oportunidad. Sin embargo, cuando se le preguntó quién iba a vigilar, insistió en no recordar. Cuando se le preguntó sobre las instrucciones sobre dónde iban a apostarse o a ubicarse con relación a la vigilancia, dijo que no habían acordado nada al respecto.

También mencionó que no contaba con radio transmisor para comunicarse entre agentes y, que la única forma de comunicarse era a través del radio en el cuartel de la policía.

Continuó su testimonio afirmando que el arresto se produjo a segundos de entrar al camino Charluisant, y fue la primera parada que realizó la caravana de tres (3) vehículos oficiales confidenciales. Señaló que, en la intervención, participaron 8 oficiales de la policía, 3 por cada vehículo, a excepción del vehículo en el que iban solo él y el Sargento Aponte. Detallo que, desde que detuvieron la marcha y se desmontó del vehículo oficial confidencial, este no se identificó como policía, no se le dio ningún comando al vehículo, y que sin haber pronunciado nada, se baja la persona del vehículo, casualmente, mostrando el arma y la cartera que le dan motivo fundado para la intervención. A pesar de haber visto a los dos

ocupantes y de saber -alegadamente- que, como mínimo, había uno armado, este no dio ningún comando, no alertó a su sargento, no pidió ayuda ni, dio aviso a los otros seis agentes, ni informó al cuartel. Tampoco solicitó ayuda de los otros agentes, ni informó al sargento cuando, aparentemente, vio al señor Barbosa Santiago manipulando un arma de fuego en el área de la consola central del vehículo. Reconoció no poseer orden judicial sobre registro y allanamiento. A preguntas de la defensa, afirmó que en su declaración jurada no dijo nada de los tatuajes de ningún individuo.

En el segundo contra, realizado por el Lcdo. Víctor Souffront Cordero, el agente reveló que lleva más de veinte (20) años en la policía de Puerto Rico. Sobre otros aspectos relevantes adicionales, se le cuestionó al agente si al momento en que observa el arma y al individuo corriendo sobre la valla, ya se encontraba desmontado del vehículo oficial confidencial, y este responde que no. Indicó que observó al individuo bajarse del vehículo con el arma a plena vista, mientras iba acompañado del Sargento Aponte y, aun así, no notificó al sargento que vio al señor Torres Rodríguez con un arma, situación que le brinda el motivo fundado para intervenir. Insistió que no se dio una instrucción, ni comando a estos individuos. Se le cuestionó si tenía algún otro motivo fundado para intervenir, de no ser por la observación del arma, y respondió que no.

Sobre la intervención con el señor Barbosa Santiago, narró que no le observó con un arma anteriormente, sino hasta que divisó a través de la puerta del vehículo que, alegadamente, el señor Torres Rodríguez la dejó abierta. Lo que no consignó en su declaración jurada. Añadió que, no es hasta que se coloca justo al lado de la puerta, entre el vehículo Outlander y la valla, que observa dentro del vehículo y logró divisar al señor Barbosa Santiago en el momento preciso en el que manipulaba el arma por el área de la consola central. Tampoco notificó a sus compañeros que el señor Barbosa

Santiago poseía un arma de fuego, no dio instrucciones, ni transmitió motivo fundado para que los demás agentes intervinieran o pasaran a buscar al individuo que se fue a la huída.

Así, analizados el testimonio del agente Miranda Pérez y la prueba documental presentada, el TPI procedió a declarar *Ha Lugar* a las peticiones de supresión de evidencia de los coacusados.

Ello tras razonar que:

> El agente cuenta con experiencia de más de 20 años en la Policía de Puerto Rico y ha participado en intervenciones de este tipo. Este fue parte de un operativo en zonas de alta incidencia criminal, operativo que requería, como parte del plan de trabajo, la intervención de varios agentes de la uniformada. A pesar de su experiencia en situaciones como la de autos, de su testimonio surge que no informó al Sargento Aponte, ni a ningún otro oficial en los otros vehículos, del supuesto avistamiento de dos personas armadas en la zona de alta incidencia criminal en la que se encontraban. El motivo fundado para la intervención era, precisamente, el arma observada a simple vista solo por el Agente Miranda Pérez, quien decidió intervenir contra los dos coacusados sin alertar a sus compañeros, aun cuando alegadamente uno se dio a la fuga mientras estaba armado y el otro se encontraba en el vehículo con otra arma, también, a simple vista. Una vez con el supuesto motivo fundado, procedió a incautar el resto de la evidencia aparentemente abandonada y otra, adicional, a simple vista.
>
> A su vez, el tiempo de observación con el individuo, una vez se bajó del vehículo, fue de pocos segundos y que del testimonio no se desprende que tuviera la oportunidad de identificarle bien, por lo que se arrojan dudas sobre la identificación del sujeto que se fue a la huida. De manera que, por todo lo expresado -según surge del testimonio del agente- se encontraba ante un testimonio estereotipado. Ello por entender que es un testimonio flaco, que solo contiene detalles mínimos dirigidos a establecer los elementos del delito a través de un relato irreal o improbable.
>
> Por lo que, determinó *Ha Lugar* las mociones de supresión de evidencia presentadas por los recurridos.

En desacuerdo con lo determinado, el Ministerio Público acude ante este foro apelativo, mediante el recurso de *certiorari* de epígrafe, imputándole al TPI haber incurrido en el siguiente error:

> EL TRIBUNAL DE PRIMERA INSTANCIA ABUSÓ DE SU DISCRECIÓN E INCURRIÓ EN UN CRASO Y MANIFIESTO ERROR DE DERECHO AL SUPRIMIR LA EVIDENCIA ILEGAL INCAUTADA, TRAS CONCLUIR QUE EL TESTIMONIO DEL AGENTE RADAMÉS MIRANDA PÉREZ EN LA VISTA DE SUPRESIÓN FUE ESTEREOTIPADO.

Acompañando su recurso de *Certiorari,* el peticionario adjuntó la regrabación de la vista.

El 8 de julio de 2025, la parte recurrida presentó un escrito intitulado *Moción Solicitando Desestimación del Recurso de Certiorari por Incumplimiento con las Reglas 29, 34 y 76 del Reglamento del Tribunal de Apelaciones.* Mediante el cual solicitó la desestimación del recurso. Arguyó que, cuando se levanta un error relacionado a la apreciación de la prueba oral, el peticionario tiene el deber de incluir la transcripción de la vista o una exposición narrativa.

El 14 de julio de 2025, el Procurador presentó su *Oposición a Moción de Desestimación.* Esbozó que la Regla 76 del Reglamento del Tribunal de Apelaciones, según enmendado, *In re Aprob. Enmdas. Reglamento TA,* 2025 TSPR 42, págs. 103-106, 215 DPR __ (2025), no descarta que, en el ejercicio de su sana discreción, el foro revisor puede eximir u ordenar la reproducción de la misma por un mecanismo distinto al de la transcripción o la exposición narrativa. En remedio, se hizo disponible para realizar la exposición narrativa o la transcripción, de así entenderlo necesario esta *Curia.* De manera que, solicitó que no se desestimara el presente recurso.

Evaluados los argumentos, el 15 de julio de 2025, emitimos una *Resolución* declarando *No Ha Lugar* a la *Moción Solicitando Desestimación...* y se concedió a la parte recurrida hasta el 29 de julio siguiente, para presentar su oposición.

En esa fecha, los recurridos presentaron su escrito intitulado *Moción en Cumplimiento de Orden y en Oposición a Expedición de Certiorari,* por lo que nos damos por cumplidos y a su vez, decretamos perfeccionado el recurso.

Analizados los escritos de las partes, el expediente apelativo y escuchada la regrabación de la vista; así como estudiado el derecho aplicable, procedemos a resolver.

**II.**

***Certiorari***

El auto de *certiorari* constituye un vehículo procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012); *García v. Padró*, 165 DPR 324, 334 (2005); *Negrón v. Srio. de Justicia*, 154 DPR 79, 90-91 (2001). Esta discreción ha sido definida en nuestro ordenamiento jurídico como una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera. No significa poder actuar en una forma u otra, haciendo abstracción del resto del derecho, porque, ciertamente, eso constituiría un abuso de discreción. *Negrón v. Srio. de Justicia, supra*, a la pág. 91.

Por consiguiente, para determinar si procede la expedición de un recurso de *certiorari,* en el que se recurre de una resolución interlocutoria, debemos acudir a lo dispuesto en la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, que lee como sigue:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari*:
>
> A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Los criterios antes transcritos nos sirven de guía para, de manera sabia y prudente, tomar la determinación de si procede o no

intervenir en el caso en la etapa del procedimiento en que se encuentra. *Torres Martínez v. Torres Ghigliotty,* 175 DPR 83, 96-97 (2008). De no encontrarse presente alguno de los criterios anteriormente enumerados en un caso que se nos presenta, no procede nuestra intervención. Así, pues, es norma reiterada que este foro intermedio no habrá de intervenir con el ejercicio de la discreción del Tribunal de Primera Instancia, "salvo que se demuestre que hubo un craso abuso de discreción, prejuicio, error manifiesto o parcialidad". *Trans-Oceanic Life Ins. v. Oracle Corp.,* 184 DPR 689, 709 (2012), citando a *Lluch v. España Service Sta.,* 117 DPR 729, 745 (1986).

Por su parte, en nuestro ordenamiento jurídico, la discreción ha sido definida como una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera. Lo anterior no significa poder actuar en una forma u otra, haciendo abstracción del resto del derecho, porque, ciertamente, eso constituiría un uso excesivo de discreción. *Pueblo v. Rivera Santiago,* 176 DPR 559, 580 (2009); *Negrón v. Srio. de Justicia, supra.*

**La Regla 234 de las de Procedimiento Criminal**

La Sección 10 del Artículo II de la constitución del Estado Libre Asociado de Puerto Rico, establece la protección de los ciudadanos contra registros, allanamientos y arrestos sin una orden judicial previa expedida solo cuando exista causa probable. Por ello, nuestros tribunales han realizado un gran esfuerzo para crear un balance cuando dicho derecho conflige con el interés del Estado de combatir la criminalidad. El objetivo es proteger la intimidad y dignidad del ser humano contra ataques abusivos a su honra, reputación y su vida privada o de actuaciones arbitrarias del estado. *Pueblo v. Cruz Calderón,* 156 DPR 61, 68 (2002).

Como puede observarse, el criterio rector de la Sección 10 de la Constitución del ELA, *supra,* es la razonabilidad. Véase E. L.

Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. 1, págs. 281-284. Además, en esta opera la llamada regla de exclusión la cual forma parte del texto de la Sección 10. *Íd.*, a la pág. 283. La regla de exclusión es el mecanismo para hacer valer la protección constitucional al impedir el uso de prueba ilegalmente obtenida para fines sustantivos. *Íd.*, págs. 284-304.

En ese sentido, la intervención sin orden judicial previa se presume irrazonable y, por lo tanto, invalida. *Pueblo v. Blasé Vázquez*, 148 DPR 618, 631 (1999). Sobre esta presunción de irrazonabilidad, su efecto es el de revertir el peso de la prueba, que ahora recaerá sobre el Ministerio Público para mostrar la razonabilidad de la intervención. *Íd.* Ahora bien, esto no significa que la presunción de irrazonabilidad, sea argumento suficiente para solicitar la supresión de la evidencia. *Íd*, a la pág. 633.

En Puerto Rico, el mecanismo procesal adecuado para la exclusión de prueba obtenida a través de un arresto, registro o allanamiento irrazonable, sin orden judicial, es la moción de supresión de evidencia que se encuentra en la Regla 234(a) de las de Procedimiento Criminal, 32 LPRA Ap. II, R. 234. La referida norma dispone, en lo aquí concerniente, lo siguiente:

> La persona agraviada por un allanamiento o registro ilegal podrá solicitar del tribunal al cual se refiere la Regla anterior la supresión de cualquier evidencia obtenida en virtud de tal allanamiento o registro, o la devolución de la propiedad, por cualquiera de los siguientes fundamentos:
> (a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro.
> (b) …
> (c) …
> (d) …
> (e) …
> (f) …
>
> En la moción de supresión de evidencia <u>se deberán exponer los hechos precisos o las razones específicas que sostengan el fundamento o los fundamentos en que se basa la misma</u>. […] **El tribunal vendrá obligado a celebrar una vista evidenciaria con antelación al juicio, y ante un magistrado distinto al que atenderá**

> **el juicio,** cuando se trate de **evidencia incautada sin previa orden judicial** si en la solicitud la parte promovente **aduce hechos o fundamentos que reflejan la ilegalidad o irrazonabilidad** del registro, allanamiento o incautación. El Ministerio Público **vendrá obligado a refutar la presunción de ilegalidad** del registro o incautación y **le corresponderá establecer los elementos que sustentan la excepción correspondiente al requisito de orden judicial previa**. De declararse con lugar la moción, la propiedad será devuelta, si no hubiere fundamento legal que lo impidiere, y **no será admisible en evidencia en ningún juicio o vista**.
>
> (. . .)

De igual forma, se reitera que "[l]a Regla 234 de las de Procedimiento Criminal es el mecanismo procesal mediante el cual se puede reclamar los derechos que se consagran en el Artículo II, Sección 10, de nuestra Constitución." *Exposición de Motivos de la Ley núm. 44 de 1 de junio de 2007* (Ley núm. 44-2007).

Resaltamos que, por enmienda introducida por la Ley núm. 44-2007, se establece que la vista evidenciaria debe celebrarse "si en la solicitud la parte promovente aduce hechos o fundamentos que reflejan la ilegalidad o irrazonabilidad del registro, allanamiento o incautación." Regla 234 de las de Procedimiento Criminal, *supra*. Tras el promovente cumplir con este requisito, el registro o allanamiento efectuado se presume ilegal y es el Ministerio Público quien viene obligado a rebatir esa presunción mediante la presentación de prueba que establezca una de las excepciones reconocidas por nuestro ordenamiento jurídico sobre la procedencia de un registro o allanamiento sin orden judicial. *Pueblo v. Báez López,* 189 DPR 918, 955 (2013); *Acarón et al. v. D.R.N.A.,* 186 DPR 564, 573 (2012); *Pueblo v. Rivera Rivera,* 117 DPR 283, 292 (1986). Sin embargo, puntualizamos que la obligación del Estado de presentar prueba no exime al promovente, como requisito de umbral, de la necesidad de acreditar que es el agraviado por el registro o allanamiento ilegal, según surge de la primera oración de

la propia Regla 234, *supra*. E. L. Chiesa Aponte, op. cit., pág. 331-332.

Como corolario de lo anterior, el agraviado debe exponer las razones específicas que sostengan los fundamentos en los que basa su debida moción de supresión. *Pueblo v. Blasé Vázquez*, supra, a las págs. 633-634. Ante ello, no basta con que establecer que la intervención se efectuó sin orden judicial previa, sino que debe acompañar hechos y argumentos que reflejen la ilegalidad o irrazonabilidad de la misma. *Íd.*

Es norma trillada que en la vista de supresión de evidencia no está en controversia la culpabilidad o inocencia del acusado, pues lo que se persigue es determinar la legalidad o razonabilidad del registro realizado. *Pueblo v. Rivera Rivera*, supra, a la pág. 290.

Por último, el derecho a solicitar la supresión de evidencia es uno personal que solo lo puede ejercer la persona a quien se le haya violado el derecho constitucional contra los registros y allanamientos irrazonables. *Pueblo v. Ramos Santos*, 132 DPR 363, 371 (1992).

**El testimonio estereotipado**

Respecto a la normativa del testimonio estereotipado, nuestro más alto foro ha expresado que "un testimonio estereotipado es aquel que se reduce a establecer los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlo." *Pueblo v. Acevedo Estrada*, 150 DPR 84, 93 (2000); *Pueblo v. Rivera Rodríguez*, 123 DPR 467, 480 (1989); *Pueblo v. Almodóvar*, 109 DPR 117, 125 (1979); *Pueblo v. González Del Valle*, 102 DPR 374, 376 (1974). Se trata de un testimonio flaco y descarnado dirigido a establecer de manera mecánica los elementos del delito. *Pueblo v. González Del Valle*, supra, a la pág. 379.

Por su naturaleza este tipo de testimonio debe evaluarse con suspicacia. Ello es así, para evitar que mediante declaraciones

inexactas o falsas se violenten los derechos de ciudadanos inocentes. *Íd.* Por ello, la jurisprudencia ha desarrollado una serie de criterios que deben considerarse a la hora de evaluar un testimonio estereotipado, primero, todo testimonio estereotipado debe escudriñarse con especial rigor; segundo, tanto los casos de la evidencia abandonada o lanzada al suelo como los casos del acto ilegal a plena vista deben, en ausencia de otras consideraciones, inducir sospecha de la posible existencia de testimonio estereotipado; tercero, si el testimonio es inherentemente irreal o improbable debe ser rechazado; cuarto, el testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles; quinto, por el contrario, la presencia de contradicciones, lagunas o vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones y; sexto, no debe olvidarse que el peso de la prueba de librar el testimonio estereotipado de sospecha recae en el fiscal. Tal peso no se descarga con la extracción del testimonio flaco y descarnado. *Íd.*

A su vez, la referida doctrina jurídica ha expuesto que el testimonio estereotipado puede perder su condición como tal, si va más allá de los elementos y particulares mínimos del delito y provee detalles sobre la investigación, o las razones que motivaron al agente a intervenir con el alegado delincuente. *Pueblo en interés Menores A.L.R.G. y F.R.G.*, 132 DPR 990, 1007 (1993).

**El concepto de Motivos Fundados**

La Regla 11 de Procedimiento Criminal, 34 LPRA Ap. II, R. 11, en lo pertinente establece que:

> Un funcionario del orden público podrá hacer un arresto sin la orden correspondiente:
>
> a. Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito en su presencia. En este caso, deberá hacerse el arresto inmediatamente o dentro de un término razonable después de la comisión del delito. De lo contrario, el funcionario deberá solicitar una orden de arresto.
>
> b. Cuando la persona arrestada hubiese cometido un delito grave *(felony)* aunque no en su presencia.
>
> c. Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave, *(felony),* independientemente de que dicho delito se hubiere cometido o no en realidad.

Nuestro ordenamiento jurídico reconoce que el concepto de motivos fundados alude a aquella información o conocimiento que lleva a una persona ordinaria y prudente a la creencia de que el arrestado ha cometido un delito; esto independientemente de si, en efecto, tal haya sido la situación. *Pueblo v. Marrero*, 213 DPR 404, 416 (2023); *Pueblo v. Calderón Díaz*, 156 DPR 549, 559 (2002); *Pueblo v. Ruiz Bosch*, 127 DPR 762, 770 (1991). De este modo, en aras de determinar si el agente del orden público tuvo motivos fundados para creer que la persona a ser arrestada ha delinquido en su presencia, su conducta debe ser juzgada de acuerdo a la apreciación que una persona prudente y razonable haría de las particularidades del caso. *Pueblo v. González Rivera*, 100 DPR 651, 654 (1972). Así pues, en el correcto análisis de esta norma, precisa concluir que la existencia de motivos fundados está supeditada a criterios de probabilidad y razonabilidad.

La exigencia de un *quantum* de prueba, similar al requerido por la autoridad judicial para permitir la intervención del Estado con los individuos, cumple con el propósito de armonizar las excepciones dispuestas en ley y la protección constitucional a ciertos derechos del ciudadano frente a actuaciones arbitrarias del Gobierno Central. "Los motivos fundados constituyen el mínimo de información que razonablemente podría convencer a un juez de que existe causa

probable para expedir una orden de arresto. Por ello, el agente que realice el arresto, sin la orden correspondiente, debe observar o estar informado de hechos concretos que razonablemente apunten a la comisión de un delito." *Pueblo v. Calderón Díaz*, supra, a la pág. 559. Para que esta actuación se repute legal, es fundamental que el conocimiento del representante del Estado esté apoyado en datos que tiendan a establecer la probable ocurrencia de un acto delictivo.

**La apreciación de la prueba y el estándar de revisión apelativa**

Nuestro más alto foro ha establecido claramente que los foros apelativos solo intervendrán con la apreciación de la prueba que haga el foro de instancia, cuando se demuestre que la intervención del juzgador sobre los hechos en controversia se encuentra viciada por pasión, prejuicio, parcialidad o error manifiesto. *Colón v. Lotería*, 167 DPR 625, 659-660 (2006); *Colón v. Glamorous Nails*, 167 DPR 33, 59 (2006); *S.L.G. Giovanetty v. ELA*, 161 DPR 492, 518 (2004); *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Esto implica que los tribunales apelativos deben rendir deferencia a la apreciación de la prueba que realiza un tribunal de instancia. *McConnell v. Palau*, 161 DPR 734, 750 (2004).

Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones ponderadas del foro de instancia. *Rolón v. Charlie Car Rental, Inc.*, 148 DPR 420, 433 (1999). Esto porque, los juzgadores de primera instancia se encuentran en mejor posición de aquilatar la prueba testifical, observar el comportamiento de los testigos mientras declaran y adjudicar la credibilidad que merezcan. *Arguello v. Arguello*, 155 DPR 62, 79 (2001); *Orta v. Padilla*, 137 DPR 927, 937 (1995).

Sobre el particular, las Reglas de Procedimiento Civil disponen que las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto, a menos que sean claramente erróneas, y se dará

la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. Regla 42.2, de las Reglas Procedimiento Civil, 32 LPRA Ap. V, R. 42.2. Esto porque, al evaluar la prueba oral, el juzgador de instancia tiene que ponderar integradamente los siguientes aspectos: (1) el comportamiento del testigo mientras declara y la forma en que lo hace; (2) la naturaleza o carácter del testimonio; (3) el grado de capacidad del testigo para percibir, recordar o comunicar cualquier asunto sobre el cual declara; (4) declaraciones anteriores de la persona testigo; (5) existencia o inexistencia de cualquier prejuicio, interés u otro motivo de parcialidad por parte de la persona testigo; (6) existencia o inexistencia, falsedad, ambigüedad o imprecisión de un hecho declarado por la persona testigo y; (7) carácter o conducta de la persona testigo en cuanto a veracidad o mendacidad. Regla 608, inciso (B) (1-7) de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 608. En ese sentido, si al evaluar las transcripciones de la prueba oral, la naturaleza de los testimonios es creíble y los mismos no reflejan contradicciones, el foro apelativo no podrá sustituir el criterio del foro de instancia con el suyo propio.

**III.**

En síntesis, el Procurador señaló, como único error, que el TPI abusó de su discreción al suprimir la evidencia del Ministerio Público tras concluir que el testimonio del Agente Radamés Miranda Pérez es uno estereotipado.

De entrada, destacamos que al palio de la Regla 40 de nuestro Reglamento, *supra*, determinamos que están presentes algunos de los criterios enumerados en la norma, por lo que expedimos el auto y confirmamos la *Resolución* recurrida.

En nuestro análisis integral de la controversia y, conforme al derecho previamente esbozado, nos corresponde analizar lo acontecido en la vista de supresión de evidencia. Por tanto, a

continuación, procedemos a detallar las porciones del testimonio del

Agente Miranda Pérez más relevantes e íntimamente relacionados al

asunto que estudiamos.

A preguntas del Ministerio Público, sobre la intervención del

11 de mayo de 2022, el Agente Miranda Pérez testificó que:[4]

> R: [. . .] en horas de la mañana comparecí aquí al tribunal de Mayagüez y en horas de la tarde, pues, pasé a la División de Drogas y Vicios de Mayagüez y recibo las instrucciones del sargento Luis R. Aponte.
>
> P: ¿Cuáles fueron esas instrucciones?
>
> R: Pues, que iba a participar, honorable, junto a un grupo de trabajo que había en la división de un plan de trabajo de vigilancia preventiva y patrullaje.
>
> P: ¿En qué consistía ese plan de vigilancia preventiva y patrullaje?
>
> R: A mí la asignación que me dieron es que iba a pasar en un vehículo oficial confidencial, en este trabajo iba a estar acompañado del sargento Luis R. Aponte, con el otro personal que estaba con nosotros en el plan íbamos a pasar hacia el área de Las Marías, Maricao… en el área de Mayagüez, pero específicamente nos dirigíamos hacia esa área.
>
> (. . .)
>
> R: Nos dirigimos desde la División de Drogas y Vicios de Mayagüez por la carretera 106 en dirección de… de Las Marías.
> P: Ajá… y le pregunto: ¿qué pasó, si pasó algo, cuando ustedes van de camino hacia Las Marías por la carretera 106, que sea el motivo que usted esté hoy declarando en horas de la mañana de hoy?
>
> R: ¡Claro que sí! Honorable, cuando íbamos en dirección por la 106, subiendo hacia Las Marías, el sargento indica para entrar al camino Charluisant, honorable, esto queda en la misma carretera 106, un **lugar de alta incidencia criminal, ya que personalmente he efectuado con compañeros agentes de drogas y otras divisiones, intervenciones en ese lugar.**
>
> P: ¿Y qué pasó cuando el sargento Aponte decide entrar al camino Charluisant?
>
> R: Una vez el sargento, hace… vira hacia la izquierda para lograr el acceso a este camino, puedo observar, honorable, que, en el medio, ya en el camino Charluisant, dentro de como tal del camino, hay un vehículo Mitsubishi Outlander color azul claro estacionado en el mismo medio de la carretera.
>
> P: Ajá… y entonces, le pregunto: una vez ustedes los agentes observan eso, ¿qué pasó?

---

[4] Énfasis nuestro.

R: Pues, el sargento tiene que detener la marcha ya que no había paso. Es un camino estrecho, honorable, de dos direcciones. El sargento detiene el vehículo de nosotros frente a este vehículo. **Puedo observar que hay dos ocupantes en el interior del mismo**.

(. . .)

P: Y le pregunto: ¿a qué distancia usted observó que había unos individuos en el vehículo frontal?

R: **Aproximadamente como un vehículo de distancia, honorable.**

P: ¡Okey! ¿y qué procede a hacer usted, si hizo algo, una vez divisa que hay dos individuos?

R: Yo, nada, permanecí en mi área esperando a ver qué iba a pasar con el vehículo si se iba a mover para nosotros continuar.

P: Hasta ese momento, ¿qué acto ilegal, si alguno, usted ha observado con relación a ese vehículo o las personas que lo ocupaban?

R: **Lo que había observado hasta el momento, era una obstrucción al tránsito. Que era que estaban estacionados en el medio**.

P: Y, entonces, usted indica que estaba esperando a ver si el vehículo se movía.

R: Eso es así.

P: ¿Y qué pasó entonces?

R: **Inmediatamente puedo observar que en el área del conductor se desmonta un ciudadano, honorable, el cual vestía una *t-shirt* color negra con un pantalón corto azul que es el señor Ricardo Torres, que es el que está atrás del Lcdo. Roland Arroyo.**

P: Y le pregunto: una vez usted observa e identifica esta persona ¿qué pasó, si pasó algo?

R: Observo, honorable, **que este ciudadano al desmontarse del vehículo lleva en su mano derecha una pistola color negra y anaranjada y, en su mano izquierda, lleva una cartera color negra**.

P: Y, una vez entonces observa qué tiene lo que usted ha descrito como una pistola ahí en la cartera, ¿qué pasó?

R: Este joven... este ciudadano, se dirige, honorable, hacia el lado del vehículo de él, que hay una valla. **Cuando este joven trata de brincar la valla, se tropieza con la misma y se va de boca por encima de la valla. Yo me desmonto del vehículo y me acerco hasta la valla** por donde él se había...

P: Y si lo sabe, ¿por qué razón es que ocurre esta situación de que el brinca la valla?

R: Pues, es, lo que yo pude observar...

**P: ¿Cuándo usted observa que el brinca la valla [inaudible] donde estaba usted?**

**R: Como le indiqué, en el interior de mi vehículo lado frontal, lado derecho, y ahí, pues, observo cuando él se tropieza y se va de boca.**

P: ¡Okey! Y, entonces, usted ve que este joven cae y ¿qué pasó?

R: Pues yo me desmonto de mi vehículo oficial, me dirijo hacia el área por donde él se había... por donde él se había, pues, ocurrió la caída al observar, honorable, **veo que él sigue rodando porque era un área, como una cuesta bastante empinada que sigue bajando por la cuesta**. **Puedo observar, honorable, que por el área donde él cayó pude observar la pistola color anaranjada y el bulto, la cartera, pues, la cartera color negro que estaba en el área del suelo.**

P: ¿Y luego qué hizo?

R: Pues, ahí le indico "alto policía", pero el joven siguió monte abajo. **Observo... observé un movimiento en el... en el interior del vehículo Mirage, Outlander, disculpe y, al observar, veo al pasajero que es el señor Alejandro Barbosa que es el que está sentado al lado del licenciado Victor, eh, el licenciado Souffront el cual lo veo que está en su mano derecha tiene una pistola color negra, honorable, y la está llevando al área de la consola central ahí tiene una especie de gaveta que se encuentra en este lugar.**

A preguntas del fiscal, sobre la pistola como motivo fundado para la intervención, el Agente Miranda Pérez narró que la vio por primera vez:

R: Cuando el señor se desmonta del área del conductor y huye hacia el área del monte.

Por otro lado, sobre la intervención con el señor Barbosa Santiago, es menester destacar el siguiente extracto del interrogatorio directo realizado por la fiscalía al Agente Miranda Pérez:[5]

P: Le pregunto: entonces, agente, ¿en qué momento es que usted se percata de que esta segunda persona tiene esa pistola?

R: **Cuando lo observo en el interior del vehículo desde el área de al lado de la valla yo estaba, honorable, entremedio del vehículo y la valla el ciudadano al desmontarse del vehículo había dejado la puerta abierta y por eso es que yo puedo observar lo que él estaba haciendo.**

---

[5] Énfasis nuestro.

> P: Y una vez se percata de que la está llevando el área del centro eso que usted describe como una pistola, ¿qué pasó?
>
> R: Yo cogí, pues, que levante la mano que suelte el arma, él me obedece las instrucciones que le doy, le digo que se baje del vehículo, me identifico como agente de la policía, le indicó el motivo de mi intervención, lo pongo bajo arresto, **[inaudible]** lo dejo con ayuda del sargento Aponte, lo dejo, pues, en custodia, ocupo el arma de fuego, lo dejo en custodia y ocupo el arma que era del señor Ricardo y la cartera.
>
> P: Le pregunto: ¿cuándo es qué por primera vez usted observa un acto ilegal en ese lugar?
>
> R: Cuándo él se va a correr con el arma de fuego y la cartera, que brinca el área de la valla que se tropieza, que se va a por el área de la valla ahí era que yo iba intervenir con ese ciudadano. **Eso fue lo que me dio el, el motivo para intervenir.**
>
> P: ¿Cuándo es que surge entonces algún motivo para intervenir con el señor Alejandro Barbosa?
>
> R: **Alejandro, una vez lo observo cuando está con el arma color negra verdad que le está introduciendo en el área [inaudible].**

A su vez, sobre la identificación del señor Torres Rodríguez, quien presuntamente se fue a la huida, el Agente Miranda Pérez aseguró que, mientras entregaba la evidencia para la prueba de campo, se recibió una llamada telefónica en el área del retén en la que una voz masculina le dijo que su hijo, Ricardo Torres Rodríguez, había sido parte de una intervención, según le narró la madre de este. Sobre este particular, puntualizamos del directo la siguiente porción:

> P: Y, cuándo usted recibe esa información, que, de ese hombre, Ricardo Torres ¿qué usted hizo?
>
> R: Yo lo que hice, honorable, fue que verifiqué la información en el sistema de… de para verificar, sabe, de obras públicas y pude ver la foto del señor Ricardo Torres, la cual identifico como la misma persona la cual había abandonado el arma de fuego en la intervención en el área del camino Charluisant como la misma persona.

En el contrainterrogatorio, efectuado por el licenciado Arroyo Rojas, en cuanto al momento en que los agentes llegaron al camino

Charluisant, a intervenir con el señor Torres Rodríguez, debemos destacar los siguientes extractos:[6]

> **P: ¿El sargento dio algún comando a ese vehículo?**
>
> **R: No.**
>
> **P: ¿Usted le dio algún comando?**
>
> **R: No.**
>
> **P: ¿Alguien le dio un comando?**
>
> **R: No.**
>
> **P: Se detienen e inmediatamente se bajó una persona.**
>
> **R: Sí, señor.**
>
> **P: Sin ustedes haberle dicho nada.**
>
> **R: Eso es así.**
>
> **P: Sin ustedes haberle encomendado nada.**
>
> **R: Eso es así.**
>
> **P: ¿Y usted dice que esa persona se baja y usted observa que está de frente a usted?**
> **R: Sí, señor.**
>
> **P: Mire, usted no describe en su declaración jurada haber visto tatuaje, ¿verdad que no?**
>
> **R: No.**
>
> **P: Ni de su informe tampoco lo indica, ¿verdad que no?**
>
> **R: No.**
>
> P: Mire y usted ve una persona de frente, ¿a qué distancia?
>
> R: Como a un vehículo de distancia.
>
> P: ¿Más o menos como entre usted y yo?
>
> R: Sí, un poquito más.
>
> **P: Se baja, y usted lo ve con un arma.**
>
> **R: Eso es así.**
>
> **P: En ese momento usted no habló con el sargento.**
>
> **R: No.**
>
> **P: No le dijo tiene un arma.**
>
> **R: No.**

---

[6] Énfasis nuestro.

**P: Usted simplemente se bajó.**

**R: ¡Unjú!**

**P: ¿Y más gente estaban detrás de usted?**

**R: ¡Unjú!**

**P: Usted tampoco pidió ayuda, ¿verdad que no?**

**R: No.**

**P: Tampoco dijo: "¡cuidado que está armado!", ¿verdad que no?**

**R: No.**

Por su parte, el licenciado Souffront Cordero, tuvo la oportunidad de contrainterrogar al testigo como parte de la defensa del señor Barbosa Santiago. Así, destacamos los siguientes extractos del testimonio del Agente Miranda Pérez:[7]

**P: ¿Ese vehículo no estaba cometiendo ningún delito, verdad que no?**

**R: No, claro que no.**

P: No. Según usted ha mencionado, estaba interfiriendo con la vía pública.

R: Sí.

**P: ¿Qué bocina o qué órdenes o comandos ustedes le dieron para que se moviera?**

**R: Ninguno.**

P: ¿Qué información le solicitaron para decirle mire vamos a pasar muévase?

R: Ninguna.

P: Ninguna, según usted que se veía de frente, ¿qué hacían los individuos cuanto usted los vio por primera vez?

R: En el interior del vehículo.

**P: ¿Que hacían? ¿Dialogaban? ¿miraban hacia el frente? ¿hacia el lado? ¿hacia la parte posterior?**

**R: Estaban sentados en el vehículo.**

**P: Sentados en el vehículo, ¿usted no ve ningún movimiento de parte de ellos?**

**R: No.**

P: Y su vehículo continúa, ¿correcto? y se para a menos de 12 pies. ¿Sí o no?

---

[7] Énfasis nuestro.

R: Sí.

**P: Y sin razón aparente alguna, en cuestión de segundos, según usted, sale un individuo con un, alegadamente, un arma en las manos, ¿correcto?**

**R: Sí, señor.**

P: ¿Usted no le había dicho "parece de ahí", verdad que no?

R: No.

**P: "¿Qué hacen ahí?", ¿verdad que no?**

**R: No.**

**P: "Denme sus documentos", ¿verdad que no?**

**R: No.**

P: "Muevan el vehículo", ¿verdad que no?

R: No.

**P: "Es la policía, ¡sálganse! ¡vamos!"**

**R: No.**

**P: Oiga, y según usted, ¿si alegadamente esa persona no sale con un arma en la mano, usted no tenía motivo para intervenir?
R: No.**

**P: Pero sin razón ninguna, abre la puerta y sale corriendo -no tan solo con un arma escondida- sino a plena vista, ¿correcto?**

**R: Eso es así.**

**P: Sí. Según usted ha declarado, a su sargento no le dijo: "mira tiene un arma".**

**R: No.**

**P: Usted no le dijo a su sargento: "mira tiene un arma".**

**R: No.**

P: Oiga, y según usted ha declarado que esta persona sale brinca una valla y cae.

R: Eh...

P: ¿Sí o no?

R: No la brincó, se fue por eso se fue por ahí.

P: ¿De qué tamaño era esa valla? según su declaración jurada.

R: Era de metal.

P: Altura, altura ¿qué altura?

R: Como a la cintura.

P: ¿Dónde dice eso en su declaración jurada?

R: No dice eso.

P: ¿Perdón?

R: No dice eso.

P: **Le pregunto: ¿si en su declaración jurada lo que usted lo que vio fue que brincó la valla?**

**R: No.**

P: ¿No?

R: No.

**P: O sea, ¿que no es correcto decir "me acerco al área donde este ciudadano había brincado", eso no es correcto?**

**R: Son parecida sí.**

P: No, esa no es la pregunta.

R: Sí, sí.

**P: Sí, que había brincado. Y cae y según usted se le cae el arma y no la coge, sino que la deja en ese lugar.**
**R: Eso es así.**

P: ¿Perdón?

R: Sí, señor.

**P: Hasta ese momento usted no se había desmontado del vehículo, ¿verdad que no?**
**R: No.**

**P: ¿Tampoco dice en su declaración jurada si dejó la puerta abierta o cerrada?**

**R: ¿Quién? ¿él?**

**P: La persona, sí.**

**R: No, no.**

**P: ¿Perdón?**

**R: No lo dice.**

P: Bien. ¿Según usted, usted se baja y va directamente al área donde usted alega que esa persona se cayó, correcto?

R: Sí, señor.

P: Y si usted está a doce pies, la persona sale corriendo brinca y se cae usted abre la puerta, correcto, y va hacia donde alegadamente cayó, ¿verdad que sí?

R: Sí, señor.

P: Y eso tomó múltiples segundos.

R: Sí.

P: Digamos que un minuto.

R: No, no tanto.

P: ¿Cuánto? ¿Treinta segundos?

R: Precisar no, pero fue bien rápido.

P: ¿Cuánto según su declaración jurada cuánto? ¿Cuánto tiempo?

R: No, no.

**P: No menciona. Oiga, y aunque usted dice que ve que sale y brinca la valla, usted abre la puerta, camina esos doce pies, se dobla para recogerla y, mira, y ahí es que, alegadamente, usted dice que ve a Don Alejandro, supuestamente, intentando guardar un arma.**

**R: Sí, señor.**

**P: No lo hizo cuando el otro salió corriendo, según usted, ¿verdad que no?**

**R: No.**

**P: No lo hizo mientras usted caminaba, sino cuando usted alegadamente está paralelo, que usted nos dice si dejó la puerta abierta o no, ¿correcto?**

**R: Como le expresé horita sí.**

**P: Usted le dijo al tribunal que en su declaración jurada no consta si usted consignó o que usted no consignó que estaba la puerta abierta, ¿correcto?**

**R: En la declaración jurada no lo dice.**
**P: ¡Bien! Mire, y según usted, en todo ese tiempo no es hasta que usted se queda alegadamente perpendicular que usted ve que alegadamente esa persona está guardando un arma.**

**R: Sí. Eso es así, señor.**

P: ¿Según usted en qué momento sus compañeros se enteraron que había un arma en el lugar que trataron de localizar al individuo en su declaración jurada?

R: Como le indiqué hace un momento…

P: ¿Según usted quién le comunicó a esos compañeros o que **[inaudible]** tenía un arma?

R: ¿En la declaración jurada?

P: Sí.

**R: No, no lo manifesté.**

> P: En el testimonio que usted ofreció hoy, ¿en qué momento y quién les dijo a esos compañeros que pasaran a buscar a esa persona?
>
> R: No lo manifesté anteriormente.
>
> **P: Oiga, y usted dice que había tres vehículos y usted estaba a doce pies, si cogemos tres carros quedarían en la carretera 106, ¿cómo que ustedes no podían entrar?**
>
> **R: Ante eso por lo menos...**
>
> **P: ¡Perdón! Quedarían afuera en la 106.**
>
> **R: Eso es así.**
>
> **P: ¿Y eso surge de su declaración jurada?**
>
> **R: No.**
>
> P: Mire, ¿quiénes estaban, según su declaración jurada, detrás de usted? Inmediatamente, el primer carro.
>
> R: ¿El ocupante inmediato?
>
> R: No, no recuerdo.
>
> P: ¿Perdón?
>
> R: No recuerdo.
>
> **P: Mire, y usted alega que era un área de alta incidencia y que, alegadamente, había un arma, ¿en ningún momento le dijo a ninguno de sus compañeros "hay un individuo armado"?**
>
> **R: No.**
>
> **P: No. Según usted, su compañero, que era el sargento Aponte, cuando usted se baja, que usted no le dice porque se baja, según usted ha declarado en su declaración jurada, ¿correcto?**
> **R: No, yo no le mencioné.**
>
> **P: Nada.**
>
> **R: No le indiqué que estaba armado.**

Asimismo, en el contrainterrogatorio continuó sobre la intervención con el señor Barbosa Santiago y el motivo fundado para intervenir con éste. Sobre este particular, distinguimos la siguiente porción de la vista:[8]

> **P: ¿Y dónde menciona en su declaración jurada que el sargento se bajó hacia don Alejandro para intervenir con él?**
>
> **R: No, no. Eso no lo menciono.**

---

[8] Énfasis nuestro.

**P: Mire, ¿dónde, qué motivo le dio al sargento por el cual iba a intervenir con don Alejandro?**

**R: Ninguno.**

P: Perdón.

R: El sargento no iba a intervenir con Alejandro.

P: No iba a intervenir. Oiga, pero usted ha dicho que el sargento fue el que acudió por el área de Alejandro y que usted lo dejó en custodia de Alejandro.

R: **[inaudible]**

**P: ¿Sí o no?, ¿En qué momento usted le dijo los motivos para dejar a Alejandro en custodia de él?**

**R: No, no. No recuerdo habérselo dicho.**

P: ¿En qué momento usted le dijo "mire, ocupe un arma que estoy viendo" o cuando alegadamente se estaba bajando a recoger y se encuentra una arma tirada "está armado, está guardando un arma"?

R: ¿Qué arma licenciado?

P: ¿Usted no dice que usted vio a don Alejandro, alegadamente, depositando un arma en la guantera?, en la consola, perdón.

R: Exacto, eso es así.

**P: ¿En qué momento usted grita "mire está guardando un arma en la consola"?**

**R: No, yo no grité eso.**
**P: ¿Perdón?**

**R: Yo no grité eso.**

**P: ¿En qué momento le dijo a alguien según su declaración jurada lo que usted había visto?**

**R: No lo indica, no.**

**P: ¿Perdón?**

**R: No lo indica.**

Analizado minuciosamente el testimonio vertido por el Agente Miranda Pérez, tal y como lo expresa muy bien fundamentado el TPI, no cabe duda de que el mismo es uno estereotipado por solo contener detalles mínimos para sostener un delito, y al ser uno inherentemente irreal o improbable. Asimismo, ante la presencia de las dos modalidades de testimonio estereotipado más conocidas, como el de la evidencia abandonada y la evidencia a simple vista, el Ministerio Público no logró que el testimonio del agente perdiera su

condición de ser catalogado como uno estereotipado. Por lo que, se trata de un testimonio flaco y descarnado dirigido a establecer de manera mecánica los elementos del delito. *Pueblo v. González Del Valle*, supra, a la pág. 378.

Según surge del testimonio del testigo, en la vista de supresión de evidencia, este es agente de la Policía de Puerto Rico con una experiencia de más de veinte (20) años. El 11 de mayo de 2022, el Agente Miranda Pérez formó parte de un equipo de policías asignados en vehículos oficiales confidenciales como parte de un plan de vigilancia y prevención que no pudo detallar, tan siquiera, quién iba a vigilar ni las áreas específicas a ser impactadas. Primariamente, advertimos, que la presencia de contradicciones, lagunas o vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones. *Íd.*

Por su parte, y como consecuencia de este supuesto plan, la caravana de vehículos confidenciales se dirigió por el camino Charluisant, identificado por el testigo como un área de alta incidencia criminal y, a segundos de adentrarse en el estrecho camino, se encontraron con el vehículo Outlander en medio de este. Solo vio a dos individuos dentro del vehículo, sin entender que estaban cometiendo delito alguno. Sin embargo, y a pesar de no tener motivos fundados para intervenir, sin mediar instrucción o comando alguno en contra de los dos ocupantes del carro, el Agente Miranda Pérez declaró que el señor Torres Rodríguez se baja del asiento del conductor, **mostrando un arma y una cartera**, **a plena vista**, lo que da motivo fundado para intervenir con ellos. Más aún, y todavía sin recibir orden, el señor Torres Rodríguez se va a la huida por una pendiente empinada, tropezando con la valla, **dejando la puerta abierta del conductor**, **y sin motivo alguno abandonó el arma y la cartera tipo bulto** que motiva la intervención. Asimismo, no obviemos que cuando esto sucede al Agente Miranda Pérez

todavía estaba sentado en el vehículo oficial. Es decir, el señor Torres Rodríguez, **sin ser perseguido por un oficial,** dejó **abandonada el arma y la cartera por supuestamente haberse tropezado en la valla. Por tanto, nos parece poco creíble que este haya dejado estos artículos al suelo para que un oficial los encuentre y los pueda ocupar. Más aún, no realizó ningún esfuerzo para recogerlos máxime cuando nadie lo estaba siguiendo.**

Enfatizamos, a que a preguntas del licenciado Souffront Cordero el testigo aseveró que, si el señor Torres Rodríguez no hubiese salido con un arma en la mano, no tenía motivos para intervenir.

De otro lado, precisa destacar que el Agente Miranda Torres aseveró que, por razón de que el señor Torres Rodríguez dejó la puerta abierta, **es que se percata cuando se baja para recoger el arma**, que el señor Barbosa Santiago intentaba ocultar un arma dentro del vehículo. Sobre este aspecto, nos resulta altamente irreal la casualidad de que el señor Barbosa Santiago **esperara hasta que el agente quedara cerca y de manera paralela a él**, por la puerta que dejó abierta el otro coacusado cuando salió del vehículo, para intentar esconder el arma. En este sentido, recalcamos que nos parece poco probable que el señor Barbosa Santiago **no guardó el arma ni intentara hacerlo,** mientras el señor Torres Rodríguez salió del vehículo ni cuando el Agente Miranda Pérez se bajó del auto oficial y caminó doce (12) pies para dirigirse hacia la valla para ir detrás del señor Torres Rodríguez y recoger el arma del suelo.

Resaltamos **que la declaración, respecto a que el señor Torres Rodríguez al salir del automóvil dejó la puerta abierta, fue manifestada por vez primera en la vista de supresión, ya que el agente Miranda Pérez afirmó que no dispuso nada sobre este asunto en su declaración jurada**.

En este análisis, no podemos ignorar que el Agente Miranda Pérez aseguró que, conforme a su experiencia y conocimiento, el área del camino Charluisant es de alta incidencia criminal, lo que presupone un plan de protección más definido por parte de la policía. Por lo que no podemos entender, cabalmente, cómo es que cuando el agente vio al señor Torres Rodríguez, con un arma en la mano y ante dos individuos armados, no alertó, avisó, ni informó al Sargento Aponte, ni a los otros agentes de la observación de armas de fuego o de la obtención de motivo fundado para intervenir con estos. Tampoco les solicitó cooperación ni apoyo.

Por último, el Agente Miranda Pérez declaró que, al llegar al cuartel, aseguró que se recibió una llamada en el retén y producto de esta, decide buscar al sospechoso en la plataforma de información del Departamento de Obras Públicas. Así pues, y luego de ver la foto registrada en dicho sistema, se percata era la misma persona, señor Torres Rodríguez, que había visto tiempo atrás en la intervención. Ello, a pesar de que de su testimonio surge, como esbozó el TPI, que nunca tuvo oportunidad real de verle de frente, a no ser por **pocos segundos**, cuando la persona se bajó del vehículo y le dio la espalda para correr por la pendiente. Por lo que, estamos ante una identificación que, sin lugar a dudas, nos arroja serios cuestionamientos.

A base de todo lo antedicho, según razonó el TPI y coincidimos con su raciocinio, reiteramos que nos encontramos ante un testimonio estereotipado, según plantearon los recurridos, cuya sospecha de ser así catalogado, no pudo ser rebatida adecuadamente por el Ministerio Público, según hemos explicado extensamente. No cabe duda de que el testimonio del Agente Miranda Pérez, ofrecido en la vista de supresión de evidencia, aquilatado por el foro recurrido, y quien mejor pudo observar el comportamiento de agente mientras declaró y adjudicar la

credibilidad que le mereció, resultó insuficiente para establecer una de las excepciones reconocidas por nuestro ordenamiento jurídico sobre la procedencia de un registro o allanamiento sin orden judicial.

Por lo que, resulta forzoso concluir que el foro recurrido razonó correctamente al suprimir la evidencia obtenida como resultado de esta intervención ilegal. Insistimos que fue el propio Agente Miranda Pérez, quien reconoció que no tenía motivos fundados más allá de la observación del arma a la que hace alusión en su testimonio.

Por ello, es menester apuntalar que nos vemos impedidos de intervenir en la evaluación y apreciación de la prueba oral que realizó el foro primario y en la adjudicación de credibilidad en ausencia de evidencia que demuestre que actuó con pasión, prejuicio o parcialidad, o incurrió en error manifiesto.

En consecuencia, expedimos el presente auto y confirmamos la determinación recurrida.

**IV.**

Por los fundamentos antes expuestos, determinamos expedir el recurso de *certiorari* solicitado y confirmar la *Resolución* recurrida. La juez Lebrón Nieves disiente sin opinión escrita.

Notifíquese **inmediatamente**.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones